UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| RONALD WAYNE EVANS, Individually, | § | |
| and as Administrator of THE ESTATE of | § | |
| LISA EVANS, Deceased, and as Next Friend | § | |
| of NICHOLAS TYLER EVANS, a Minor | § | |
| Child, BONNIE BARNETT, and | § | |
| DONALD L. MANSKER, JR. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V-03-09 |
| | § | |
| TOYOTA MOTOR CORPORATION, and | § | |
| TOYOTA MOTOR SALES, U.S.A., INC., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM AND ORDER

Pending before the Court are Defendants' Motion to Exclude the Toxicology Opinions of

Paul Radelat (Dkt. #117); Defendants' Motion to Exclude the Testimony of Allan Kam (Dkt.

#118); Defendants' Motion to Exclude the Testimony of Robert Swint (Dkt. #119); Defendants'

Motion to Exclude the Testimony of Joseph Ware (Dkt. # 121); and Defendants' Motion to Exclude

the Testimony of Gerald Rosenbluth (Dkt. # 122).  The Court, having considered the motions, the

arguments of the parties, and the applicable law, is of the opinion that Defendants' motions should

be DENIED.

Also pending is Defendants' Motion to Exclude the Testimony of Edward Fritsch (Dkt. #

120).  The Court held a hearing on the motion on August 4, 2005.  After considering the motion, the

response, and the evidence submitted at the hearing, the Court is of the opinion that the motion

should be DENIED.

This products liability case arises out of an incident that occurred at Plaintiffs' residence

on June 29, 2002.  According to Plaintiffs' allegations, Lisa Evans pulled her 2000 Toyota Land

Cruiser into the garage and placed the vehicle in what she thought was "park."  Mrs. Evans left the vehicle running and got out to remove items from the vehicle's cargo area.  According to Plaintiffs' defect allegations, the Land Cruiser was not in "park" at this time, but was actually in a position between "park" and "reverse."  This alleged position between "park" and "reverse" caused the vehicle to slip into "reverse," and Mrs. Evans became positioned between the Land Cruiser's open door and the side of the garage.  Mrs. Evans died as a result of the injuries she received in the accident.

Plaintiffs filed suit on January 21, 2003.  Plaintiffs allege causes of action based on strict liability, negligence, misrepresentation, and breach of warranty, claiming that the design of the Land Cruiser's transmission allowed the transmission to be placed in a position between "park" and "reverse,"  which allowed the vehicle to slip out of gear and roll backwards.

## Discussion

Defendants filed motions to exclude the testimony of each of the following witnesses: Paul Radelat, Allan Kam, Robert Swint, Joseph Ware, and Gerald Rosenbluth,[1] arguing that each of these individuals should not be allowed to testify as an expert in this cause of action.  The Court will address the qualifications and arguments relating to each individual below.

"Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals Inc*., 509 U.S. 579, 589 (1993)).  "This obligation pertains not only to scientific evidence but to 'all expert testimony.'"  *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 580 (5th Cir. 2001) (quoting

---

[1]Defendants also filed a motion to exclude the testimony of Edward Fritsch, which will be addressed in a separate order.

*Kumho*, 526 U.S. at 147).  "A district court should refuse to allow an expert witness to testify if it

finds that the witness is not qualified to testify in a particular field or on a given subject."  *Wilson*

*v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).

The Fifth Circuit has found that assisting the trier of fact means "the trial judge ought to

insist that a proffered expert bring to the jury more than the lawyers can offer in argument."  *Salas*

*v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (quoting *Eymard v. Pan Am. World Airways*, 795

F.2d 1230, 1233 (5th Cir. 1986)); *see also Matherne v. MISR Shipping Co.*, 1991 U.S. Dist.

LEXIS 7723 *2 (E.D. La. 1991) (excluding expert whose testimony "would offer little more than

argument").  The district court's responsibility "is to make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*,

526 U.S. at 152, 119 S.Ct. 1167.

Federal Rule of Evidence 702, which was amended in 2000, provides as follows

concerning the admissibility of testimony of an expert witness:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods reliably to the facts of
> the case.

FED.R.EVID. 702. "Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific

testimony is both reliable and relevant." *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th

Cir. 1999). The Fifth Circuit has described this Court's gatekeeping function under Rule 702 and

*Daubert* as follows:

> Many factors bear on the inquiry into the reliability of scientific and other expert
> testimony, including, but not limited to, whether the expert's theory or technique: (1)

3

can be or has been tested; (2) has been subjected to peer review and publication;
(3) has a known or potential rate of error or standards controlling its operation; and
(4) is generally accepted in the relevant scientific community.

*Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577 (5th Cir. 2004) (citing *Daubert* at 593-94.

The first step in the analysis, then, is to determine whether the expert's testimony is reliable, which requires "an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Curtis v. M & S Petroleum, Inc*., 174 F.3d 661, 668 (5th Cir. 1999). Whether an expert's testimony is reliable is a fact-specific inquiry. *Skidmore v. Precision Printing and Pkg., Inc.*,188 F.3d 606, 618 (5th Cir. 1999). The 2000 amendments to Rule 702 reflect the Supreme Court's determination that the reliability analysis must remain flexible: not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant. *Kumho* 526 U.S. at 151. The four factors identified in Daubert thus form the starting point of the inquiry into the admissibility of expert testimony. *Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 245 (5th Cir. 2002) (quotation omitted). The Court may also consider other factors, if relevant, such as "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," and "[w]hether the expert has adequately accounted for obvious alternative explanations." FED.R.EVID. 702 advisory committee's notes (2000 Amendment). Although the Daubert analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, however, the test does not evaluate the expert conclusions themselves. *Daubert*, 509 U.S. at 594-95; *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

**Paul Radelat**

4

Defendants assert that Paul Radelat should not be allowed to offer expert testimony regarding toxicology at trial[2] because Radelat is not a qualified toxicologist.  Further, Defendants assert that Radelat's opinions are not reliable because they are based only on his subjective opinion without any supporting evidence.  They argue that he has failed to fully analyze the potential effects that all the relevant drugs, both individually and in combination, could have had on Lisa Evans at the time of the incident.  Finally, they challenge Radelat's opinions as being unnecessarily cumulative of Plaintiffs' other toxicology experts.

Defendants' first objection to Radelat as an expert is that he is not qualified to render opinions in the area of toxicology.  Defendants assert that toxicology constitutes its own separate and specialized field with its own degree program and Radelat does not hold a degree in toxicology.  Further, Defendants assert that Radelat has never authored any articles about toxicology and that he has has never taught any classes in toxicology.  Although Defendants acknowledge that Radelat taught a course in "forensic medicine" at the University of Houston Law School, they assert that the course was taught at least seven years ago and that a class on forensic medicine taught at a law school does not qualify as an actual toxicology class.  Finally, Defendants argue that Radelat admits that he would defer to a toxicologist on some issues and that this admission shows how unqualified he is to testify as to toxicological issues.

Plaintiffs counter that Radelat is qualified to give expert testimony on toxicolgical issues, and assert that his credentials and qualifications are extensive.  Additionally, Plaintiffs assert that there is nothing within Rule 702 that requires Radelat to be a specialist in the field of toxicology in

---

[2]Defendants do not challenge Radelat's qualifications as a medical doctor or as a pathologist.  Nor do they challenge his ability to testify as to the cause of Linda Evans death or the pain and suffering she experienced immediately prior to her death.  Rather, Defendants challenge the portion of Radelat's opinion which discusses "toxicology issues relating to the drugs in [Linda] Evans system at the time of the incident.

order to present his opinions.  Furthermore, Plaintiffs argue that, as Radelat pointed out in his deposition, he is board certified in clinical pathology, a branch of pathology that investigates diseases using laboratory methods, including toxicology.  Plaintiffs also assert that Radelat has received training in toxicology, has been retained as an expert to address toxicological issues, and has testified in cases involving issues similar to those involved in this case.

The Court finds that Dr. Radelat's credentials are sufficient to allow him to testify concerning the effects of particular drugs on the human body.  Dr. Radelat obtained his medical degree in 1957, was a teaching fellow at Columbia University prior to beginning his residency, and then conducted his residency in Panama and at Louisiana State University.  Radelat is board certified in Clinical Pathology and Anatomic Pathology.  He is currently an Assistant Professor of Pathology at Baylor University College of Medicine in Houston and is on the staff of the Department of Pathology of St. Joseph Hospital in Houston and St. Joseph Hospital in Clear Lake. Furthermore, Radelat has previously served as the Chief of Laboratory Service at the U.S. Naval Hospital and as a staff pathologist at numerous hospitals.  Finally, as Radelat explained in his declaration,

> [a]s a clinical pathologist, I have directed laboratories in which chemical analyses were performed for ethanol, marijuana, cocaine, Valium, and other potentially toxic substances.  I have evaluated the results of these analyses, discussed the effects of various blood levels with the treating physicians and subsequently received appropriate feedback.  As an anatomical pathologist, I have studied and examined numerous tissues for morphologic changes induced by toxic substances and I have performed well over 2000 post-mortem examinations with the toxicity of various poisons and drugs frequently in mind as a cause of death and of lesser tissue damage.

Although Radelat readily acknowledges that "there are many who have developed a focused interest in the more narrow field of substance toxicology," he also states that "as a pathologist, I am also a toxicologist with knowledge, training, experience, and expertise."  Given

6

his forty-seven years as a pathologist and his qualifications as a board certified clinical pathologist, the Court agrees.  The distinction between a pathologist and a toxicologist is one which the Court finds goes more to the weight of the testimony rather than its admissibility, and Defendants will have an opportunity to highlight those distinctions for the jury on cross-examination.  *See, e.g., In re Silicon Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879 (C.D. Cal. 2004) (holding that pathologist's lack of sub-speciality credentials affected the weight of his testimony, not its admissibility); .

Defendants, however, also object to Radelat's methodology, arguing that his opinions are not reliable because there is "too great an analytical gap between the data and the opinion proffered."  Specifically, Defendants argue that Radelat's opinions are flawed in at least three ways: first, Radelat did not consult with any outside materials or references in forming his opinions; second, Radelat did not attempt to analyze the effects that the drug Flexeril would have had on Mrs. Evans; and third, Radelat did not analyze the combined synergistic effect that marijuana, valium, and Flexeril would have had on Mrs. Evans.

To support its first contention, that Radelat's methodology is flawed because he did not consult outside materials, Defendants assert that the accepted toxicology methodology adopted by the World Heath Organization, National Academy of Sciences, and various United States government agencies includes as its second step "evaluation, based on published scientific literature, of the exposure necessary to produce the adverse effects associated with the chemicals to which individuals may be exposed."  *See Mancuso v. Consol. Edison Co. of NY, Inc.*, 967 F. Supp. 1437, 1445 (S.D.N.Y. 1997).  The court in *Mancuso*, citing an eastern District of Virginia case, outlined the  methodology for determining the possible effects of a toxin on individuals as follows:

[ (1) ] First, an evaluation is made of the chemicals to which the individual might have been exposed, and of the concentrations of these chemicals in air breathed by the individual. [ (2) ] The second step involves and (sic) evaluation, based on the published scientific literature, of the exposures necessary to produce the adverse effects associated with the chemicals to which individuals may be exposed. [ (3) ] These two evaluations are then combined in the final step of the risk assessment to provide an estimate of the likelihood that any of the harmful properties of any or all of the chemicals might have been expressed in the exposed individual.

*Id.* (citing *Cavallo v. Star Enter.*, 892 F. Supp. 756, 764 (E.D. Va. 1995)).  Initially, the Court notes that both cases, however, involve the concept of an expert rendering an opinion as to the cause of a given injury using a process called differential diagnosis, whereby medical doctors "experienced in diagnostic techniques provide testimony countering other possible causes . . . of the injuries at issue."  *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 270 n.6 (3d Cir. 1991).  There is no evidence, however, that a differential diagnosis was necessary or asked for in this case. Additionally, the Court notes that, as Radelat noted on his invoice, he reviewed the pharmacology of various drugs.  Additionally, the Court notes that the test outlined by Defendants requires that the evaluation be based on published scientific literature.  It does not require that the published scientific literature be consulted contemporaneously with the analysis.  Thus, Radelat meets the requirements of the second step of the test outlined by Defendants because, as he stated in his declaration, he has routinely read multiple peer-reviewed journals that deal with toxicology issues and has in his library numerous authoritative works that deal with the same subject. The fact that Radelat does not have to refer to these tomes for every case he analyzes is not, in the Court's opinion, surprising, given his forty-seven years of experience dealing with these types of isses. *See Newman v. Motorola, Inc.*, 218 F. Supp. 2d 769 (D. Md. 2002) (experts' application of their extensive epidemiological and oncological knowledge to subject of radiofrequency radiation (RFR) was well within their areas of competence).

Defendants next argue that Radelat's methodology is questionable because he did not

8

attempt to analyze the effect that the drug Flexeril would have had on Mrs. Evans, or the synergistic effect that a combination of Flexeril, marijuana, and Valium would have had on her system.  Radelat, however, has stated that he is unfamiliar with Flexeril and further stated in his deposition that he will not testify regarding Flexeril or its effects at trial.   That Radelat stopped short of providing an opinion on a subject for which he recognized he was not qualified does not, in the Court's opinion, call into question the methodology of the rest of his report.  As Plaintiffs' note, no expert is required to offer an opinion as to every medical issue that may be raised.  That is why both sides have retained numerous experts on various aspects of their individual cases.  Moreover, to the extent that Defendants wish to cross examine Radelat as to whether the inclusion of Flexeril in Mrs. Evans system changes his analysis or opinions, they will have the opportunity to do so. Therefore, to the extent that Radelat offers testimony within his area of expertise, those conclusions will be admissible.

Defendants final argument to exclude Radelat's opinions is that they are needlessly cumulative of the opinions of Plaintiffs' other toxicologists.  Plaintiffs respond that the objection is premature until evidence is received at trial.  Additionally, Plaintiffs contend that one of the main opinions about which Radelat will testify is his conclusion in his second report that the drugs and metabolites found in Mrs. Evans system do not in any way impact the opinions presented in his first report regarding the cause of her death and the pain and suffering experienced by her.  As Radelat is apparently the only expert testifying as to the cause of death and pain and suffering, he is in the unique position to expound upon whether the substances mentioned had any effect on that initial opinion.  Furthermore, as Defendants acknowledge Radelat's expertise in the area of pathology, this opinion would fall squarely within his area of expertise.  As such, the Court finds that the testimony is not cumulative.  The motion to exclude the toxicology opinions of Paul

Radelat is, therefore, DENIED.

**Allan Kam**

Defendants next challenge the expert testimony of Allan Kam.  Defendants assert that Kam's testimony on National Highway Transportation Safety Administration ("NHTSA") standards is inadmissible under Federal Rule of Evidence 704 because it constitutes an opinion on a conclusion of law.  Defendants argue that Kam will not testify about any particular defect in the vehicle in question or whether the vehicle complied with an allegedly applicable standard.  Instead, Defendants assert that the only basis for Kam's testimony is to provide an opinion on a conclusion of law, thus encroaching on the duty of the trier of fact as the interpreter of the law in this case.  Additionally, Defendants assert that Kam's testimony about the history of the NHTSA, the process for creating the Federal Motor Vehicle Safety Standards ("FMVSS"), the Office of Defect Investigation, and any other background information relating to the Safety Act is not relevant.  They further assert that nothing in Kam's testimony will help the jury resolve factual disputes at issue in this case because the testimony has no relationship to any issues in this case.  As such, they seek to exclude Kam's testimony under Rules 401, 402, and 702 of the Federal Rules of Evidence.

Federal Rule of Evidence 704(a) states that opinion testimony otherwise admissible is not objectionable because it includes an ultimate issue to be decided by the trier of fact; Federal Rule of Evidence 702 permits the district court to admit expert testimony that will assist the trier of fact in either understanding the evidence or determining a fact in issue. Neither rule, however, permits expert witnesses to offer conclusions of law. *C.P. Interests, Inc. v. California Pools, Inc.*, 238 F.3d 690, 697 (5th Cir. 2001) (citing *Owen v. Kerr McGee Corp.*, 698 F.2d 236, 240 (5th Cir.1983)).

The key question, then, is whether Kam's testimony will include his opinions as to the conclusion to be drawn regarding whether the vehicle at issue was unreasonably dangerous, or whether the Defendants were grossly negligent.  The Court finds that Kam's testimony does not provide these types of conclusions.  Rather, as Plaintiffs note in their response, Kam's testimony, which is mostly rebuttal in nature, will provide background information regarding the FMVSS.  He will also express his opinion that, generally, the fact that an automobile meets the requirements of the FMVSS does not necessarily mean that the subject vehicle is without defect.  It will be up to the jury to determine whether such was the case with the subject Land Cruiser.

Defendants also object to Kam's testimony on the grounds that it is not relevant to the issues presented in this case.  If Defendants, however, assert that the vehicle met the requirements of the FMVSS and, therefore, imply that the vehicle must have been "safe" or without defect, Plaintiffs are entitled to provide evidence to rebut those conclusions.  Thus, the Court finds that the relevancy argument is one best addressed as the evidence is presented at trial.

**Robert Swint**

Defendants assert that Robert Swint should not be allowed to offer expert testimony regarding the subject Land Cruiser's transmission at trial.  Defendants argue that Swint has no training, experience, or education regarding automotive transmissions.  Additionally, Defendants argue that even if Swint is qualified to offer expert opinions, his initial report to the Sugar Land Police Department should be excluded because it is unreliable and based on incomplete analysis.  Further, Defendants maintain that Swint's testimony is needlessly cumulative of the testimony of Plaintiffs' other experts and should, therefore, be excluded.

In challenging Swint's credentials, Defendants cite to the Fifth Circuit Court of Appeals holding in *Wilson v. Woods*.  163 F.3d 935 (5th Cir. 1999).  In *Wilson*, the Fifth Circuit upheld the

district court's finding that plaintiff's proffered expert did not qualify to testify as an expert in accident reconstruction because he lacked the requisite training, experience, and qualifications. *Id.* The district court conducted an extensive review of the expert's qualifications and found that he (1) had never conducted any studies or experiments in the field of accident reconstruction; (2) did not take any measurements or collect any data from the accident scene in this case; (3) did not examine the tires or other mechanical parts involved in the accident; (4) based his calculations on publicly accessible data published by the NHTSA; and, (5) was unable to show that his training or experience as a mechanical engineer gave him expertise in the field of accident reconstruction that was distinguishable from training received by other mechanical engineers. Additionally, in response to questioning from defendant's counsel, the proffered expert admitted that (1) although the purported expert taught college level courses, he never held professorial rank; (2) he never taught an accident reconstruction course or any other course that involved automobile accident reconstruction; (3) he had no degree or certification in accident reconstruction (but he was enrolled in a correspondence course from the Northwestern Traffic Institute); (4) he had not completed the requirements for certification by the Association of Accident Reconstructionists; and, (5) although he had testified in various cases, one court had refused to qualify him as an expert in vehicle accident reconstruction based on his lack of qualifications.

In stark comparison to the credentials of the proffered expert in *Wilson*, Swint's credentials and qualifications establish his expertise in the area of accident reconstruction. His curriculum vitae indicates that he has taught numerous seminars on accident reconstruction; he is a member of numerous professional organizations, including the Texas Association of Accident Reconstruction Specialists; and he has testified as an accident reconstruction expert on numerous occasions. Additionally, with regard to this specific case, the evidence suggests that Swint

12

performed specific tests on the subject Land Cruiser and based his calculations on more than just information readily accessible to the general public.

The Court notes that much is made of the fact that Swint is not a specialist in transmissions. The evidence does not suggest, however, that Swint will be called upon to discuss the design specifications of the subject transmission, or the potential areas in which that design was defective. Rather, from the evidence before the Court, it appears that Swint's opinion will be limited to questions relating to the ability of an individual to obtain a "false park" when manipulating the gear shift. His credentials, in the Court's opinion, adequately allow for him to render such an opinion. As such, the Court finds that his qualifications meet the standards necessary to testify as an expert in the field of accident reconstruction.

Defendants also object to the initial report prepared by Swint and his associates at the behest of the Sugar Land Police Department. Defendants assert that the report is inadmissible because the report is based on unreliable and incomplete analysis. Defendants assert that testing the "feel" of the Land Cruiser's transmission shift lever to other vehicles after visually inspecting the Land Cruiser and manipulating the transmission is inadequate. Plaintiffs counter that the methodology used by Swint is not only adequate, it is the most obvious and reliable choice for testing the ability of an individual to place the subject transmission into a "false park" without being aware that he or she had done so.

In *Nemir v. Mitsubishi Motors Corp.*, the Sixth Circuit Court of Appeals approved of the type of methods used by Swint in his analysis, calling the method "purposeful manipulation." 381 F.3d 540, 555 (6th Cir. 2004). In its finding that the district court erred in excluding the testimony, the court of appeals found that the "point of the purposeful manipulation was to show that [the alleged design defect] could occur under certain circumstances . . ." *Id.* The court further stated

that "before [plaintiff] could convince the jury that [the alleged defect] occurred during the accident, he had to show the jury that [the alleged defect] was something that could have happened during the accident . . ." *Id.*  The court thus concluded that the only way to demonstrate that the alleged defect could have occurred in a laboratory setting was through purposeful manipulation. *Id.*

The Court agrees that purposeful manipulation in this case is one way to show that the "false park" alleged by Plaintiffs could have occurred during the accident.  Swint used individuals with different body structures to attempt to recreate the "false park" in a variety of conditions, and documented his findings both in a written report and through the use of a video recording which shows the tests as they were being performed.  As such, the Court finds that the report summarizing these conclusions is reliable and admissible.  That Swint conducted additional tests at the request of Plaintiffs' counsel after the litigation was filed does not diminish the findings he initially presented to the Sugar Land Police Department.  Therefore, the motion to exclude the testimony of Robert Swint is DENIED.

**Joseph Ware**

Defendants argue that Joseph Ware should not be allowed to offer expert testimony regarding the subject Land Cruiser's transmission at the trial.  Defendants assert that Ware has almost no training, experience, or education regarding automotive transmissions in general, or the transmission system on the subject Land Cruiser in particular.  Additionally, Defendant maintains that Ware's opinions are not reliable because they are based only on his subjective opinion without supporting evidence.  They argue that Ware has not reviewed any of the factual information pertinent to this incident.  Finally, Defendants maintain that Ware's testimony is needlessly cumulative of Plaintiffs' other designated expert witnesses.

Plaintiffs counter that Ware is an auto mechanic with eighteen years experience.  While it is true that he has never taught any classes or published any articles, his experience in the industry speaks for itself. Furthermore, although Defendants note that Ware has no formalized education, this is an area for cross-examination and does not, in the Court's opinion, render his experience in the industry meaningless.   Additionally, although he has not had particularized experience with the subject transmission, the Court finds that Ware is sufficiently qualified to be able to provide testimony helpful to the jury in understanding Plaintiffs' view of the alleged defect.

Defendants further argue that Ware's methodology is not reliable.  Specifically, Defendants argue that Ware tested the subject Land Cruiser, the exemplar vehicle, and other vehicles tested by sitting in them and attempting to maneuver the respective transmissions into a "false park" position.  They argue that he only conducted three "visual" inspections and that at these inspections he did not take any photographs, videotape footage, measurements, or notes.  They argue that Ware never even examined the internal transmission  mechanisms.  Additionally, they argue that Ware: has not spoken to any of the witnesses, reviewed any depositions, or reviewed any witness statements; has not reviewed any medical or autopsy reports; has not reviewed the police report; has only briefly reviewed the Land Cruiser's owner's manual; attempted to review design assembly and installation drawings but was unable to read them; and did not request or review any information from the NHTSA regarding either the Land Cruiser or other instances of inadvertent vehicle movement.

The Court first notes that Ware's failure to review the materials listed above is not fatal to his methodology in this case.  Ware's expertise has been limited to the area of the transmission of the subject Land Cruiser and comparisons he made of the workings of the subject Land Cruiser to other Land Cruisers.  He has been tendered as an expert relating to the specific design defect in the

transmission.  As such, the Court finds that it was unnecessary for Ware to interview witnesses, read their statements, read autopsy reports or anything else.  He has not opined in any way as to the cause of Lisa Evans death, the effects of the design defect or anything similar in nature.  Rather, he has limited his report to his examination of the subject transmission, his comparison of that transmission to other Land Cruisers he tested, and the conclusions he drew from those inspections.  Second, although Ware stated in his deposition that he never dropped the oil pan of the Evans' Land Cruiser, his report and deposition testimony clearly indicate that he dropped the oil pan on the exemplar vehicle, which was supposedly identical in all relevant details to the Evans' vehicle, and examined the internal transmission mechanisms of that vehicle.  He also purchased the component parts for the transmission of a 2000 Land Cruiser, including the rooster comb, the ball-and-spring tensions assembly, the linkage components and the neutral safety switch and examined those parts, both individually and in combination.

It appears clear from the report and deposition testimony that Ware ruled out alternative causes for the occurrence of the "false park" by observing that there was no sign of any work done on the transmission or the linkage.  Ware then engaged in purposeful manipulation of the subject transmission, the exemplar transmission, and the transmissions of other privately owned Land Cruisers.  As the Court noted above, purposeful manipulation is an acceptable method for determining the nature of the alleged defect in this case.  Therefore, the Court finds that the motion to exclude the testimony of Joseph Ware should be DENIED.

**Gerald Rosenbluth**

Finally, Defendants seek to exclude the testimony of Gerald Rosenbluth with regard to his specific opinions in the nature of accident reconstruction, proposed alternative designs, as well as any opinions reliant upon the reconstruction as to whether any alleged defective condition in the

Toyota Land Cruiser at issue proximately caused or contributed to the injuries, losses or damages at issue in this case.  Defendants argue that Rosenbluth is not qualified to render the opinions he has offered, particularly with regard to accident reconstruction.  They further assert that the methodology underlying Rosenbluth's opinions does not satisfy the requirements of Rule 702 or *Daubert*.

Plaintiffs counter that Rosenbuth is not being offered as an accident reconstruction specialist.  Rather, Plaintiffs argue that Rosenbluth's testimony will focus primarily on the inspection and testing of the vehicle, which he conducted, and the results of those tests.  Plaintiffs further assert that Rosenbluth's conclusions regarding the defective design of the subject transmission flow directly from his observations and testing.

Plaintiffs do not dispute that Rosenbluth is not qualified to offer an opinion as an accident reconstruction specialist or an expert in human factors.  Thus, to the extent that Rosenbluth postulated in his deposition as to what Mrs. Evans was doing immediately prior to the accident, his testimony is outside the realm of his expertise, and therefore, inadmissible.

Rosenbluth does, however, qualify as an expert in the area of industrial design and technology, specifically with regard to automotive technology.  He has taught automotive engineering for fifteen years at the high school, junior college, technical college, and university levels, including classes on automobile transmissions.  Moreover, he has personally rebuilt thousands of automatic transmissions and has modified a transmission for off road endurance races.  As such, the Court finds Rosenbluth qualified to offer an opinion as to the correct operation of a transmission and potential design defects based on his years of observation and experience.

Rosenbluth's expert report contains none of the discussion concerning possible scenarios relating to how Mrs. Evans death actually occurred that appears in his deposition.  Rather, it is a

17

fairly straightforward analysis of the subject transmission, the tests conducted by Rosenbluth and his observations of the transmission, and the conclusions he drew from those results, based on his experience and knowledge as an industrial and automotive technologist. Defendants object, however, to the methodology used by Rosenbluth in reaching his conclusion that the transmission was defectively designed. Specifically, Defendants maintain that Rosenbluth has not identified any scientific literature in support of his opinions, nor has he identified any supportive peer review process by which his analysis could have undergone critique. Furthermore, Defendants argue that, while Rosenbluth has tested his theory of how the accident occurred, his tests are, at best, inconclusive, and at worst, tend to show that the accident did not occur in the way he described.

First, Defendants argue that Rosenbluth's purposeful or manual manipulation of the transmission is, in Defendants' opinion, unreliable and unworthy of credence. However, as noted above, this Court finds that purposeful manipulation is an appropriate method for demonstrating the alleged design defect at issue in this case. Defendants next argue that Rosenbluth's statement in his deposition that the "false park" situation alleged to have occurred in this case occurred approximately 30 percent of the time is an admission of a seventy percent error rate. Whether the incidence of a false park occurs only thirty percent of the time, and thus constitutes a seventy percent error rate is an argument for and determination to be made by the jury. Finally, Defendants object to the methodology used by Rosenbluth because they claim he has not properly considered, or even done the requisite investigation to be able to consider, the factors which are necessary to determine whether a proposed alternative design would have prevented the accident in issue. That Rosenbluth did not test every possible alternative does not, in the Court's opinion, undermine the methodology used in testing the subject transmission. Rather, Rosenbluth testified at his deposition that although he had not built a Z-gated transmission for this particular case, he had

18

built an exemplar and tested it recently in another case.  Although the transmissions in the two

vehicles were not the same, this, as well as the alternative designs proposed by Rosenbluth and his

lack of testing are subjects ripe for cross-examination. The motion to exclude the testimony of

Gerald Rosenbluth is, therefore, DENIED.

**Edward Fritsch**

Defendants seek to exclude the testimony of Edward Fritsch as to whether the automatic

transmission system of the Toyota Land Cruiser vehicle  was in a defective or unreasonably

dangerous condition when it left the control of Toyota.  They also seek to exclude any testimony by

Fritsch that any such alleged condition proximately caused or contributed to the injuries, losses or

damages at issue in this suit.  Defendant asserts that Fritsch is not qualified to render the opinions

that he has offered, and that the methodology underlying Fritsch's opinions does not satisfy the

requirements of Rule 702 or *Daubert*.

Defendants initially argue that Fritsch's training as a mechanical engineer is insufficient to

qualify him as an expert on automotive transmissions.  To support this contention, Defendants

argue that Fritsch has a general background in mechanical engineering, but that he has never taken

any course dealing specifically with automotive engineering.  They argue that he has also never

taught a course on automotive design or human factors, nor has he ever published an article or

given a presentation on any topic involving automotive transmissions systems or human factors.

Defendants further maintain that Fritsch has never: (1) viewed or studied the manufacturing

process of an automatic transmission; (2) given any trial testimony in a case involving the

transmission system of a passenger vehicle or light truck; (3) consulted in such a case; or (4) had

any employment in which he has had to work on the design, development or manufacture of

automatic transmission systems.  Furthermore, Defendants contend that Fritsch, prior to his

involvement in this case, had never examined or inspected any automatic transmission system used in any passenger car or light truck, nor had he ever investigated any complaints of inadvertent vehicle movement in a motor vehicle.

Plaintiffs rebut these challenges by arguing that the mechanical engineering curriculum, which Fritsch completed with honors at Rice University, included machine design courses, which, in turn, included a consideration of automobile transmissions. The testimony and evidence presented at the hearing also clarified for the Court the specific portions of the transmission that would be the focus of the testimony at trial. Fritsch testified that the components he would be testifying and opining about do not directly involve the internal mechanisms of the transmission. The evidence presented suggests that these components, which comprise the gear shift linkage, are devices with which mechanical engineers work on a regular basis. Specifically, Fritsch testified that the gear shift linkage, comprised of four parts, is a typical representation of a four bar linkage. Fritsch testified that he was very familiar with the design and uses of a four bar linkage. Specifically, Fritsch testified that he had studied them in his mechanical design classes; designed and developed several different linkages himself during the course of his employment at the National Scientific Balloon Facility and SpaceHab; and reviewed the specifications for other four bar linkages while employed with TRW Inc.'s Mission Drilling Products ("TRW") in its Research Engineering Department. He further testified that the multi-bar linkage system is one of the oldest types of mechanical linkages and that its design and the manner in which it operates are similar whether the linkage is placed in a lawnmower or an automobile.

Fritsch also testified regarding his knowledge and use of advanced measuring instruments, including a digital protractor to measure angles in an engineering setting. During his testimony, Fritsch indicated that he had used these devices on a regular occasion during his employment with

TRW and further indicated that the use of such advanced instrumentation is actually a special field within engineering.  Fritsch used these devices to measure the angles on the rooster comb and the corresponding angles located within the neutral park switch.   Based on this testimony the Court finds that Fritsch is qualified to render opinions related to the tests he conducted on the Toyota Land Cruiser, including tests on the gear shift linkage and the neutral start switch.

Defendants next argue that Fritsch's methodology does not meet the standards and requirements laid out in Rule 702 and *Daubert*.  Fritsch provided extensive testimony at the hearing about the types of tests he conducted, and the method he used in conducting those tests. Fritsch testified that he used purposeful manipulation as one of the primary methods for testing the subject vehicle.  As the Court noted above, purposeful manipulation is an acceptable method in this case for testing the subject transmission components.   Plaintiffs also presented a video showing a portion of the testing Fritsch conducted, all of which was apparently videotaped. Fritsch also provided testimony regarding the instruments he used to conduct the testing and his familiarity with those instruments, based on his years in the research and development division of TRW.  The testing, according to the testimony, was conducted using the scientific method, thus allowing the procedure to be duplicated to check the accuracy of the results.  From this testing, Fritsch offered several conclusions as to the design of the linkage and alternative designs based on his findings.  Although Defendants argue that these alternative designs have not been tested by Fritsch, the Court finds that the alternatives presented are sufficiently linked to his area of expertise.  Additionally, any deficiencies in Fritsch's opinions and testimony will be an area ripe for cross-examination.  The Court, therefore, is of the opinion that the motion to exclude should be DENIED.

**CONCLUSION**

For the foregoing reasons, the Court finds that:

1.  The Motion to Exclude the Toxicology Opinions of Paul Radelat (Dkt. # 117) is DENIED.

2.  The Motion to Exclude the Testimony of Allan Kam (Dkt. # 118) is DENIED.

3.  The Motion to Exclude the Testimony of Robert Swint (Dkt. # 119) is DENIED.

4.  The Motion to Exclude the Testimony of Joseph Ware (Dkt. # 121) is DENIED.

5.  The Motion to Exclude the Testimony of Gerald Rosenbluth (Dkt. # 122) is DENIED.

6.  The Motion to Exclude the Testimony of Edward Fritsch (Dkt. # 120) is DENIED.

It is so ORDERED.

Signed this 9th day of August, 2005.


JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE